FILED
United States Court of Appeals
Tenth Circuit

September 20, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SCOTT LOWE,

    Defendant - Appellant.

No. 23-1156

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:20-CR-00326-WJM-1)**
_____

Jason B. Wesoky, Member of the Tenth Circuit's CJA Appellate Panel, Ogborn Mihm LLP, Denver, Colorado, for Defendant-Appellant.

Jess D. Mekeel, Assistant United States Attorney (Cole Finegan, United States Attorney, with him on the brief), United States Attorney's Office, Denver, Colorado, for Plaintiff-Appellee.
_____

Before **TYMKOVICH**, **EBEL**, and **ROSSMAN**, Circuit Judges.
_____

**TYMKOVICH**, Circuit Judge.
_____

Scott Lowe challenges his conviction for drug trafficking and unlawful possession of a firearm. He contends that the government intruded on his Fourth Amendment privacy rights when it searched a storage unit he was using in his

apartment building without permission from the manager.  When Denver Police Department officers searched the storage unit, they uncovered incriminating evidence linking Mr. Lowe to drug trafficking crimes.  Mr. Lowe moved to suppress the evidence, claiming a possessory interest in the unit that required the officers to obtain a search warrant first.  The district court denied the motion.

We affirm.  Mr. Lowe failed to establish a legitimate expectation of privacy in the storage unit.  Moreover, sufficient evidence supports his conviction, and we find no legal error in sentencing.

## I. Background

In 2014, Mr. Lowe pleaded guilty to possession of a firearm by a felon under 18 U.S.C. § 922(g)(1) and was sentenced to 48-months' imprisonment, followed by three years of supervised release.  After serving his sentence, Mr. Lowe entered supervised release under the supervision of Officer Buescher in September 2018.  He eventually moved into an apartment in Denver in August 2019.

Officer Buescher began receiving information from a confidential informant who alleged that Mr. Lowe used a storage unit to hide narcotics and firearms.  Because of the informant's unreliable history, Officer Buescher did not immediately act on the information.  When Officer Buescher eventually asked Mr. Lowe whether he had a storage locker, Mr. Lowe denied it.  Officer Buescher also contacted the building management for Mr. Lowe's apartment, who confirmed that Mr. Lowe did not rent one.

On December 2, 2019, Officer Buescher conducted an unannounced search of Mr. Lowe's apartment and cell phone.  The search uncovered messages implying involvement

in narcotics trafficking, a search history related to a firearm, and a large plastic bag containing hundreds of empty gelatin capsules in Mr. Lowe's kitchen cabinet. On February 24, 2020, during another compliance check, officers found a digital scale, plastic baggies, a pill bottle, concentrated marijuana, a pill press, and Xanax pills in Mr. Lowe's apartment. Notably, Mr. Lowe's four-year-old son pointed towards a storage room on the seventh floor, exclaiming that "Daddy goes in there all the time." Despite Mr. Lowe's denials, the officers searched a storage unit on the seventh floor but found no evidence of criminal activity there.

Three days later, Officer Buescher received a tip that Mr. Lowe had hidden narcotics and firearms in one of the first two storage units on the eighth floor of his apartment. The informant also mentioned that Mr. Lowe's associates intended to clear out the storage unit. Indeed, earlier that day, Mr. Lowe—now incarcerated on unrelated state charges—had called a friend from jail, instructing them to "clean out" a place where "extra tools" were kept. Aple. Br. at 5–6. So the informant stated that time was of the essence. Since Officer Buescher was out of town, he asked Denver Police Detectives Ryan Roybal and Jose Diaz "to investigate the information" from the confidential informant and to help search the storage unit. Reply Br. at 7–8. The Denver police and the property manager entered the eighth-floor sprinkler room and saw several storage units with "see-through" mesh or chain-link doors. Officer Buescher told the officers to search the first or second unit on the right side of the sprinkler room. The unit had a metal padlock and contained various items. Nonetheless, the property manager confirmed that the unit should have been vacant and that "nobody should have access to

3

the units unless they were paying for them." Aplt. Br. at 5. At the officers' request, the property manager consented to searching the unit and had the padlock cut.

Inside, the officers discovered: (1) a zipped suitcase containing a .40 caliber Kahr handgun with a loaded magazine and an after-market grip; (2) a plastic bag with suspected narcotics; (3) Xanax pills; (4) a Smith & Wesson box with a loaded 9-millimeter magazine; (5) other ammunition; (6) vials of unknown substances; (7) a black ski mask; (8) a black t-shirt with "Police" printed on it; (9) small plastic baggies with a "smiley devil" logo; and (10) digital scales with white residue. (A forensic analysis later showed that Mr. Lowe likely contributed to the DNA profiles on the handgun, t-shirt, and ski mask. Aple. Br. at 6 n.1.). The officers also discovered other items directly connected to Mr. Lowe: (1) a prescription; (2) correspondence; (3) a piece of paper with Officer Buescher's letterhead; (4) a prescription for his ex-wife; (5) a Social Security card; (6) a passport; (7) and correspondence for his ex-wife's brother. Following the discovery of these items, Mr. Lowe was arrested and charged with possession with intent to distribute MDMA, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm as a felon.

While incarcerated, Mr. Lowe made several incriminating admissions during jail calls, discussing efforts to retrieve valuable items from the storage unit and referring to firearms as "tools." Aple. Br. at 8. In one call, a friend informed Mr. Lowe that he had gone to retrieve some of Mr. Lowe's valuables but found the area "tor[n] out" and "ravaged." Aple. Br. at 8. Mr. Lowe denied instructing anyone to go there, and the friend assured him that the area was not marked off as evidence. In another phone call,

4

Mr. Lowe asked his wife whether she had the "two-toned one"—a description matching the Kahr handgun contained in the suitcase. Aple. Br. at 8. His wife said she did not, explaining that someone had "broke[n] into [their] storage unit." Aple. Br. at 8. Mr. Lowe told her to "chill out." Aple. Br. at 8.

Mr. Lowe moved to suppress the evidence obtained from the storage unit because the warrantless search violated his Fourth Amendment rights. The court denied the motion, ruling that Mr. Lowe lacked standing to challenge the search because he did not demonstrate a reasonable expectation of privacy in the contents of storage unit.

At trial, Mr. Lowe was convicted on all three counts, and sentenced to 123 months in prison.

## II. Discussion

Mr. Lowe presents four issues for appellate review.

*First*, he challenges the trial court's denial of his motion to suppress, arguing that Denver police obtained evidence from his cell phone and a storage locker during an unconstitutional and warrantless search, violating his Fourth Amendment rights. Mr. Lowe contends that the court erroneously found that he lacked standing to challenge these searches.[1]

*Second*, Mr. Lowe contests the jury's verdict and subsequent judgment of conviction, arguing that the evidence presented at trial was insufficient to prove he

---

[1] Mr. Lowe waived appellate review of the argument about the cell phone search because he never presented it to the district court in his suppression papers and, despite the government's notice in its brief in response, Aple. Br. at 11–13, did not show good cause on appeal for failing to raise it below. *See United States v. Burke*,

possessed a firearm in furtherance of a drug trafficking crime. Mr. Lowe contends that the government failed to demonstrate that the firearm was used to advance the drug trafficking activities.

*Third*, Mr. Lowe challenges the reasonableness of his sentence, arguing that the trial court erred in sentencing him for possession with intent to distribute both MDMA and methamphetamine. He contends that the jury only convicted him of possession with intent to distribute MDMA, and therefore, his sentence was improperly enhanced.

*Fourth*, and finally, Mr. Lowe argues that this Court should remand his case for resentencing under Amendment 821 of the Reform Act, contending that his criminal history level would be reduced from level V to level IV.

We address each in turn.

---

633 F.3d 984, 987–88 (10th Cir. 2011) ("[A] suppression argument raised for the first time on appeal is waived (i.e., completely barred) absent a showing of good cause for why it was not raised before the trial court.").

### A.    Motion to Suppress

When reviewing a district court's decision on a motion to suppress, we view the record in the light most favorable to the prevailing party and accept the district court's findings of fact unless they are clearly erroneous. *United States v. Johnson*, 584 F.3d 995, 998 (10th Cir. 2009). We review de novo the ultimate legal conclusion of whether a search was reasonable under the Fourth Amendment.

The Fourth Amendment protects "the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. To enforce the Fourth Amendment's protections, the Supreme Court has recognized that defendants in federal cases may move a district court to exclude from trial evidence obtained through an unlawful search and seizure. *See, e.g.*, *Simmons v. United States*, 390 U.S. 377, 389 (1968).

To establish a protectable Fourth Amendment interest, a defendant must demonstrate a "legitimate expectation of privacy" in the premises searched. *Terrence Byrd v. United States*, 584 U.S. 395, 403 (2018) (citation omitted). "The test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity. Rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *United States v. Ruckman*, 806 F.2d 1471, 1474 (10th Cir. 1986) (quoting *Oliver v. United States*, 466 U.S. 170, 182–83 (1984)). Indeed, a subjective expectation of privacy does not warrant Fourth Amendment protection "unless society is prepared to accept

that expectation as objectively reasonable." *California v. Greenwood*, 486 U.S. 35, 39–40 (1988).

We therefore assume—without deciding—a point neither party disputes: Mr. Lowe's subjective expectation is not the dispositive issue here.[2]  The question is whether Mr. Lowe established an expectation of privacy in the storage facility that the public would consider objectively reasonable under the circumstances of this case. *See Ruckman*, 806 F.2d at 1472.

### 1.  *Legal Framework — Objective Reasonableness*

"Determining whether an expectation of privacy is 'legitimate' or 'reasonable' necessarily entails a balancing of interests." *Hudson v. Palmer*, 468 U.S. 517, 527 (1984).  Two sets of interests are at play here.  The first is Mr. Lowe's unauthorized use of the apartment building's storage unit.  The second is the government's interest in ensuring compliance with the conditions of supervised release and the releasee's interest in maintaining privacy.  We begin with the former.

---

[2] Both parties agree that the Court can address the objective component of the legitimate expectation of privacy analysis without needing to resolve the subjective component.  *Compare* Aple. Br. at 19 ("This Court can bypass the subjective prong of the expectation of privacy analysis and address the objective prong.") (citing *Ruckman*, 806 F.2d at 1472; *with* Aplt. Br. at 30 ("[M]any courts do not distinguish between the subjective expectation and social recognition prongs 'and little attention has been given to the independent significance of the first factor or to precisely how it is to be interpreted.'")); *and* Reply Br. at 11 ("[T]his Court can and should assume Mr. Lowe 'entertained a subjective expectation of privacy' even without a statement from him 'that he had any subjective expectation of privacy.'") (quoting *Ruckman*, 806 F.2d at 1472).  *See also* Orin S. Kerr, *Katz Has Only One Step: The Irrelevance of Subjective Expectations*, 82 U. Chi. L. Rev. 113 (2015).

The Supreme Court has recognized that the "unlicensed use of property by others is presumptively unjustified." *Oliver*, 466 U.S. at 184 n.15. Moreover, the Supreme Court's holding in "*Rakas* makes clear that wrongful presence at the scene of a search would not enable a defendant to object to the legality of the search." *Byrd*, 584 U.S. at 409 (quoting *Rakas*, 439 U.S. at 141 n.9) (internal quotation marks omitted). Supreme Court jurisprudence thus "strike[s] the balance in favor," *Hudson*, 468 U.S. at 527, of preventing unlicensed or wrongful use of other's property—uses the public would generally not consider objectively reasonable.

Our longstanding precedents reflect these principles. In *United States v. Ruckman*, 806 F.2d 1471 (10th Cir. 1986), for example, we held that a trespasser on federal land had no possessory interest in a cave he was apparently living in. We explained that the government had "the rights of an ordinary proprietor"—to maintain its possession and to prosecute trespassers—concerning its "own" lands, while the defendant was a "trespasser" subject to "immediate ejectment." *Id*. at 1472–73. We therefore concluded that the defendant's subjective expectations were "not reasonable" since he could be "ousted" by the government "at any time." *Id*. If individuals have "no legal right" to occupy the land and build on it, their completed actions do not establish a reasonable expectation of privacy, even if they own the structures they built. *Id*. (citing *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 12 (1st Cir. 1975)).

Similarly, in *United States v. Jones*, 213 F.3d 1253, 1260 (10th Cir. 2000), we rejected an argument that an occupant had a protectable privacy interest in a condo

room he was not authorized to use. In analyzing whether the defendant could assert Fourth Amendment standing, we assumed that the defendant had a subjective expectation of privacy. But we concluded that the defendant's subjective expectation was not one society was prepared to recognize as reasonable. *Id.* In reaching this conclusion, we focused on the fact that the defendant "did not [get] and would not [have gotten] permission" from the owner to enter the premises. *Id*. at 1260. Consequently, the defendant's "presence" was both unauthorized—"contrary to the [owner's] contingent permission"—and "unlawful." *Id*. Therefore, despite the defendant's subjective expectations, we held that society was not prepared to recognize the occupancy as reasonable under these circumstances.[3]

Finally, in *United States v. Johnson*, 584 F.3d 995 (10th Cir. 2009), we evaluated whether an individual could legitimately expect privacy in a storage unit rented using a stolen identity. In that case, the defendant instructed his girlfriend to rent a storage unit under a false identity. After the pair were later arrested, police officers contacted the identity theft victim. She later confirmed to the police that she had not rented the unit and agreed to its search. When the victim, the detective, and the manager of the facility arrived at the unit, they found it "secured by a heavy-duty

---

[3] *Id*. (first citing *United States v. Carr*, 939 F.2d 1442, 1446 (10th Cir. 1991); then citing *United States v. Cassell*, 542 F.2d 279 (5th Cir. 1976) (concluding that the defendant could not assert standing because his unauthorized entry, contrary to the owner's instructions, were done to evade law enforcement and conceal the fruits of illegal activities thus could not confer legitimate standing)).

lock." *Id*. at 998. The manager of the facility permitted the detective to open the unit by cutting the latch. Once inside, the detective discovered contraband.

In determining whether the defendant could assert standing under the Fourth Amendment, we again assumed that the defendant had "established that he had a subjective expectation of privacy[.]" *Id*. at 999. But we nevertheless concluded that the defendant did not establish that society would recognize his subjective expectation as objectively reasonable. To reach this conclusion, we recognized that people generally have a legitimate expectation of privacy in a storage unit. *See id*. at 1001 (citation omitted) (collecting cases). We also acknowledged that this legitimate expectation could extend even to individuals who are not the lessees of those units. But we nevertheless determined that the situation in *Johnson* was "not orthodox," since the defendant "obtain[ed]" the rental unit "fraudulently." *Id*. at 1001. Moreover, the defendant "knew [that the storage] unit was not in [his girlfriend's] name." *Id*. at 998. That manner of acquisition "undermined" the "reasonableness of *any* privacy expectations[.]" (emphasis added). We refused to become "a party to [the] fraud" by "legitimizing [the defendant's] interest in the storage unit." *Id*. at 1004. Therefore, even if the defendant exhibited a subjective expectation of privacy, we held that society was not prepared to recognize it as objectively reasonable under these circumstances.

In sum, these cases show that where property use is unauthorized or obtained through fraudulent means, society is generally not prepared to consider expectations of privacy arising out of such circumstances as objectively reasonable.

### 2. *Application*

Applying these principles, we conclude that, based on the particular facts here, Mr. Lowe has failed to demonstrate a subjective expectation of privacy that the public is prepared to consider objectively reasonable.

*First*, Mr. Lowe failed to introduce any evidence that he occupied or used the storage unit—let alone with the permission of the owner, a legitimate renter, or any other person with the authority to grant such access. The property manager's records "did not show there was anyone paying" for the unit at issue. R. Vol. I at 430:22–24. Management also confirmed that Mr. Lowe did not have "any sort of storage unit or locker within the building that he had been renting out." R. Vol. I at 388:04–11. Mr. Lowe provided no evidence to suggest otherwise. Further, Mr. Lowe asserted no interest in the property seized from inside the storage unit—a suitcase containing items he claimed "belong[ed] to other people." Aple. Br. at 17 (citing R. Vol. I at 312:14–16).[4] Simply put, Mr. Lowe made no attempt at an evidentiary showing that "*his own* Fourth Amendment rights were violated by the challenged search." *Rakas*, 439 U.S. at 132 n.1. As a result, we "cannot make a determination" whether his subjective expectations were objectively reasonable. *United States v. Rascon*, 922

---

[4] Mr. Lowe "fail[ed] to assert ownership" of the storage unit or the suitcase found inside—despite "notice" from the government's arguments that he bore the burden of proof on the issue. *See* R. Vol. I at 573–76. For purposes of this review, we "must assume" that he "does not own" either. *Rakas*, 439 U.S. at 132 n.1.

F.2d 584, 587 (10th Cir. 1990). *See also United States v. Lyons*, 992 F.2d 1029, 1031–32 (10th Cir. 1993) (declining to reach objective reasonableness issue where defendant made "no attempt" to produce "any evidence" of any right or interest). Thus, we agree with the district court that Mr. Lowe failed to establish that he had a reasonable expectation of privacy in the storage unit. R. Vol. I at 354.

*Second*, even if the record supported an inference that Mr. Lowe *used* the storage unit, "[m]ere physical possession or control of property is not sufficient to establish standing to object to a search of that property." *United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995) (citing *United States v. Arango*, 912 F.2d 441, 444–446 (10th Cir. 1990)). Mr. Lowe must show a lawful basis for asserting Fourth Amendment privacy interests in the storage unit: demonstrating that he gained possession or permission from the apartment complex or someone with the authority.

Mr. Lowe failed to show that he lawfully obtained possession of the storage unit. *Arango*, 912 F.2d at 445. "[F]ail[ing] to present evidence of lawful possession" may indicate that a defendant had no reasonable expectation of privacy in the property. *United States v. Abreu*, 935 F.2d 1130, 1133 (10th Cir. 1991). Here, the record establishes that the apartment complex owned the storage units and only permitted the tenants to "rent them out." R. Vol. I at 293:16. Indeed, the property manager told Officer Diaz that "the vacant [storage] units should be vacant" and "nobody should have access to them unless they were paying for them." R. Vol. I at 430:20–22. And no evidence shows that Mr. Lowe rented a storage unit. R. Vol. I at 388:04–11. Nor did Mr. Lowe provide evidence that he "shar[ed] [a storage unit]

13

with someone" who did rent one. *Carr*, 939 F.2d at 1446 (occupant of a motel room registered to another person presented no evidence that he was in lawful possession of the room).

To be sure, "[p]roperty ownership" is not necessarily "controlling." *Abreu*, 935 F.2d at 1133. But whatever interest Mr. Lowe had in the storage unit was "certainly not as strong," *Johnson*, 584 F.3d at 1003, as it would have been if he had rented out the storage unit according to the conditions set by the property owner—the apartment complex. *See Jones*, 213 F.3d at 1260 (violating conditional permissions diminishes legitimate expectations of privacy). The district court noted that when a storage unit is used without permission, apartment management's policy is to notify the user to remove the "property improperly held in [the] unrented storage locker." R. Vol. I. at 357 n.4. After the notice period lapses, the apartment management removes the property from the storage unit, places it outside the building area, and discards it after 24 hours. R. Vol. I at 294:16–18. These facts erode Mr. Lowe's claim that his expectation of privacy was reasonable. *See Ruckman*, 806 F.2d at 1472–73 (concluding that a defendant did not have an objectively reasonable expectation of privacy in a cave owned by the government because of the vulnerability of being ejected at any moment by the government acting as an ordinary proprietor).

Absent *any* evidence showing lawful or legitimate use or possession, we conclude that Mr. Lowe failed to provide sufficient evidence to establish an objectively reasonable expectation of privacy in the storage unit. *See United States v.*

14

*Arango*, 912 F.2d 441, 445–46 (10th Cir. 1990) (lacking standing in a vehicle used without evidence of lawful possession); *United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995) (lacking standing in hotel room occupied without evidence of being an invited guest); *See Gordon*, 168 F.3d at 1226 (similar). His "unlicensed use" remains "unjustified." *Oliver*, 466 U.S. at 184 n.15.

Mr. Lowe counters by asserting that, as "a tenant in the apartment building where the storage locker was located," he had "the right and ability to utilize the storage lockers." Reply Br. at 12. He further contends that his situation is distinct because it involves "an apartment complex in which he legally resides" and "storage units that tenants have a right to use." Reply Br. at 14.

This argument fails. Mr. Lowe essentially argues that his legitimate presence on the premises of the apartment complex automatically grants him a legitimate expectation of privacy in all areas searched. We reject this reasoning. First, the Supreme Court has "abandon[ed] the 'legitimately on premises'" doctrine. *Rakas*, 439 U.S. at 141–42,147–48. Second, "even a property interest in [a] premises" may not suffice to establish a legitimate expectation of privacy with respect to specific "activity conducted" there. *Id*. at 144 n.12. So Mr. Lowe's status as a legitimate tenant in the apartment complex, by itself, is "not determinative" of whether he had a Fourth Amendment interest in the "particular area[]" searched. *Cf. id*. at 148–49 (concluding that a "passenger qua passenger" who asserts neither a property interest nor a possessory interest and disclaims any interest in the seized object has no

reasonable expectation of privacy in a glove compartment or area under the seat of the car).

So Mr. Lowe may have had "the right and ability to utilize" the property, Reply. Br. at 12, but that fact alone is trivially true. Still, it does not establish that Mr. Lowe utilized the storage in a manner that confers a *legitimate* expectation of privacy.[5] As the proponent of the motion to suppress, Mr. Lowe bore the burden of adducing facts to demonstrate a lawful basis to establish a *legitimate* use. His failure to offer *any* evidence compels the conclusion that he did not meet that burden. *See, e.g., Carr*, 939 F.2d at 1446 (concluding that a defendant who presented no evidence at the suppression hearing failed to sustain his burden of proof that he had a legitimate expectation of privacy in a room not registered to him).

*Third* and finally, even if Mr. Lowe had somehow obtained authorization to use the storage unit, "*Rakas* makes clear that wrongful presence at the scene of a search would not enable a defendant to object to the legality of the search." *Byrd*, 584 U.S. at 409 (quoting *Rakas*, 439 U.S. at 141 n.9) (internal quotation marks omitted). Here, the evidence establishes that Mr. Lowe's actions of obtaining and using the storage unit violated the terms of his supervised release. Consequently, on these facts, Mr. Lowe's claim to privacy from government intrusion is not one

---

[5] We reject Mr. Lowe's logic, which would permit him to assert a Fourth Amendment interest anywhere in the apartment building. *See Rakas*, 439 U.S. at 152 ("Allowing anyone who is legitimately on the premises searched to invoke the exclusionary rule extends the rule far beyond the proper scope of Fourth Amendment protections, as not all who are legitimately present invariably have a reasonable expectation of privacy.") (Powell, J., concurring).

"society would accept as objectively reasonable." *United States v. Marchant*, 55 F.3d 509, 516 (10th Cir. 1995) (rejecting the defendant's expectations of privacy as not objectively reasonable privacy due in part to status as prohibited person under gun law).[6]

Individuals on supervised release inherently possess reduced privacy expectations because of the heightened scrutiny required to ensure compliance with release conditions. *See United States v. Pacheco*, 884 F.3d 1031, 1041 (10th Cir. 2018) ("[W]hen the terms of a parolee's parole allow officers to search his person or effects with something less than probable cause, the parolee's reasonable expectation of privacy is significantly diminished.") (internal quotation marks omitted). And Mr. Lowe's supervised release conditions expressly required that he answer truthfully any

---

[6] *United States v. Marchant*, 55 F.3d 509 (10th Cir. 1995), provides a useful framework for this discussion. In that case, a defendant claimed a Fourth Amendment privacy interest in the information on ATF Form 4473, arguing that law enforcement officers violated his privacy by inspecting the form at a pawn shop. 55 F.3d 509, 510–12 (10th Cir. 1995). The court rejected this argument for four key reasons. *First*, the defendant's argument "disregard[ed] the significance of his status as a prohibited person under § 922(g)(1) of the GCA as amended by FOPA." *Id.* at 515. *Second*, the court declined to read the law to "create[] a reasonable expectation of privacy in ATF Form 4473 that *inures to the benefit* of a person prohibited from possessing firearms under § 922(g)." *Id.* at 515–16. *Third*, the ATF Form 4473 "was not private" and explicitly "informed [the] Defendant that an untruthful answer may subject [him] to criminal prosecution." *Id.* at 516. *Fourth*, and finally, the defendant had no lawful possession or control over the pawn shop or the form in any event. *Id.* Thus, the court concluded that the defendant's claimed privacy interest was not one society would recognize as reasonable.

The reasoning in *Marchant* parallels the reasoning here and supports our conclusion that Mr. Lowe's acquisition and use of the storage unit was "wrongful," rendering his expectation of privacy not objectively reasonable.

questions posed by his probation officer and submit his property and any area under his control to searches. *See* R. Vol. I at 25–27 (listing supervised release conditions). *See also Samson v. California*, 547 U.S. 843, 852 (2006) ("[A]cceptance of a clear and unambiguous search condition significantly diminishe[s] [a defendant's] reasonable expectation of privacy.") (internal quotation marks omitted). Mr. Lowe knew that probation officers had the legal authority to inquire about and potentially search any property he obtained.

Yet when Officer Buescher twice asked Mr. Lowe whether he had a storage unit, Mr. Lowe twice denied obtaining or possessing one. R. Vol. I at 350, 387:16 (first denial), 388:16 (second denial). *See also United States v. Hansen*, 652 F.2d 1374, 1384 n.8 (10th Cir. 1981) (concluding that the defendant's statements denying any ownership in a motel room and statements identifying item found inside as belonging to someone else "conclusively establishes" that defendant did not have a legitimate expectation of privacy in the motel room).[7] And Mr. Lowe did not

---

[7] In fact, Mr. Lowe's repeated denials of ownership, coupled with the surrounding circumstances of this case, may support concluding that he effectively abandoned any expectation of privacy in the storage unit—precluding him from challenging the search. *See United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997) ("Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned.").

Mr. Lowe's supervised release conditions required him to submit his property to searches and to tell the truth about his property. *See* R. Vol. I at 26 ¶¶ 3–4. So Officer Buescher was arguably "entitled to take [Mr. Lowe] at his word." *United States v. Denny*, 441 F.3d 1220, 1228 (10th Cir. 2006). Thus, Mr. Lowe's "express disclaimer of ownership in response to a lawful police inquiry," *id.* at 1227–28, may constitute abandonment of any expectation of privacy in the storage unit. *Cf. United States v. Ruiz*, 664 F.3d 833, 841–42 (10th Cir. 2012) (concluding that a defendant

disclose the existence of the storage unit or did not make the storage unit available for search.  Plus, the property manager's records "did not show [that] anyone [was] paying" for the storage unit *here.*  R. Vol. I at 430:22–24.  Taken together, Mr. Lowe's unauthorized acquisition of, and denial of ownership in, the storage unit directly violated his legal obligations and afforded him a greater opportunity to "conceal criminality."  *Samson*, 547 U.S. at 854.  Accordingly, Mr. Lowe's "subjective expectation of not being discovered" is "not one that society is prepared to recognize as reasonable."  *Rakas*, 439 U.S. at 143 n.12.

Recognizing Fourth Amendment interests in arrangements that evade legal supervision fundamentally contradicts the purpose and rationale of those release conditions.  It follows that Mr. Lowe's claim "cannot be reconciled," *Hudson*, 468 U.S. at 526, with the principles governing supervised release or society's interests in enforcing supervised release conditions.  Thus, we conclude that the record establishes that Mr. Lowe's acquisition and use of the unit was "wrongful."  *Cf. United States v. Dodds*, 946 F.2d 726, 729 (10th Cir. 1991) (concluding that a fugitive defendant with no interest in the apartment established no legitimate expectation of privacy in the apartment).  Accordingly, Mr. Lowe "could not expect

---

voluntarily abandoned an expectation of privacy in a rental house by "explicit[ly] stat[ing]" in letter to landlord that he no longer would be renting the property, thereby terminating the lease).

that the police were required to obtain a warrant or establish an exception to [the warrant] requirement in order to search the unit." *Johnson*, 584 F.3d at 1004.[8]

In sum, Mr. Lowe did not demonstrate standing to assert a Fourth Amendment claim in the storage unit or its contents.

### B.    *Sufficiency of the Evidence*

Next, Mr. Lowe contends that the government failed to present sufficient evidence that he possessed a firearm in furtherance of a drug trafficking crime. Before addressing this contention, we must first consider whether he preserved it for appeal.

### 1.  Preservation

Mr. Lowe stated in his opening brief that he preserved a challenge to the in-furtherance element during his oral Rule 29 motion for a judgment of acquittal when he argued that "the Government did not present sufficient evidence to prove the elements of Counts 1 and 2." Aplt. Br. at 45 (citing R. Vol. III at 58:7–15). The government argues in response that Mr. Lowe failed to preserve this argument, contending that Mr. Lowe only argued that the evidence was insufficient to support a reasonable jury finding of firearms possession.

---

[8]  The same reasons also justify rejecting Mr. Lowe's subsidiary contention that he had "a reasonable expectation of privacy in, at a minimum, the contents of the zipped suitcase[.]" Aplt. Br. at 35.  Mr. Lowe failed to assert any property or possessory interest in the suitcase or the property seized from it. *Cf. Rakas*, 439 U.S. at 148–49. Consequently, no evidence establishes that Mr. Lowe had a protectable interest in the suitcase, nor does the record establish Mr. Lowe's ownership of the suitcase.

Federal Rule of Criminal Procedure 29 permits defendants to challenge the sufficiency of the evidence at multiple stages: after the government closes its evidence, after the close of all the evidence, and within 14 days after the jury returns a guilty verdict or is discharged without a verdict. Fed. R. Crim. P. 29(a), (c); *see also United States v. Murphy*, 100 F.4th 1184, 1192–93 (10th Cir. 2024) (similar). The Rules of Criminal Procedure do not expressly permit defendants "to challenge the sufficiency of the evidence" on appeal. *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) (quoting *United States v. Goode*, 483 F.3d 676, 680 (10th Cir. 2007)) (internal quotation marks omitted). Consequently, a defendant must present claims of insufficient evidence in the first instance to the district court through a motion for a judgment of acquittal. *Id*. "When a defendant challenges in district court the sufficiency of the evidence on specific grounds all grounds not specified in the motion are waived." *See id*. (internal quotation marks and citation omitted).[9] Thus, a defendant must specify all grounds for challenging the sufficiency of the evidence in their Rule 29 motion or those unspecified grounds will be waived. "Our preservation doctrine on this point is chiefly concerned with preventing defendants from raising for the first time on appeal entirely distinct arguments from those presented to the district court." *Murphy*, 100 F.4th at 1195.

---

[9] Our precedents previously "described the failure to raise a challenge in district court as a 'waiver,'" but we have recognized that the failure is "more precisely termed a forfeiture when there is no suggestion of a knowing, voluntary failure to raise the matter." *Leffler*, 942 F.3d at 1197 (quoting *Goode*, 483 F.3d at 681)).

At the close of the government's case, Mr. Lowe made an oral Federal Rule of Criminal Procedure 29 motion. In his motion for a judgment of acquittal, Mr. Lowe argued that:

> Viewing the evidence in the light most favorable to the Government, I still argue that the Government has not proven the elements as to Count 1 and 2 beyond a reasonable doubt. *They have not tied Mr. Lowe directly to the suspected MDMA* or to . . . *the .40-caliber Kahr handgun that was found in the storage unit.* So I would argue that the case should be dismissed as to those two counts at this time.

R. Vol. III at 58: 7–15 (emphasis added).[10]

The government asserts that Mr. Lowe's Rule 29 motion for acquittal argued only that there was insufficient evidence that he possessed a firearm. Aplt. Br. at 33. Because these are two separate "inquiries and elements," the government argues that we should review only for plain error. Aplt. Br. at 33 (citing *United States v. Rufai*, 732 F.3d 1175, 1189 (10th Cir. 2013)). Since Mr. Lowe did not raise a plain error in his opening brief, the government argues his challenge has reached "the end of the road." Aplt. Br. at 33 (citing *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011)).

Convicting Mr. Lowe under § 924(c)(1)(A)(i) required proof beyond a reasonable doubt of (1) a drug trafficking crime; (2) possession of a firearm; and (3) possession of the firearm in furtherance of the drug trafficking crime. To meet the

---

[10] Count One was for possession with intent to distribute a mixture and substance containing a detectable amount of MDMA, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1); Count Two was for possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

"in furtherance element," the government needed to prove beyond a reasonable doubt that "the weapon furthered, promoted or advanced a drug trafficking crime." *United States v. Luke-Sanchez*, 483 F.3d 703, 706 (10th Cir. 2007) (quoting *United States v. Robinson*, 435 F.3d 1244, 1251 (10th Cir. 2006)) (alterations omitted). "This requires that the government establish some nexus between the firearms and the underlying drug trafficking crime." *Id*.

Mr. Lowe challenged the government's evidence as insufficient to "tie[] Mr. Lowe to the suspected MDMA" and insufficient to "tie[] Mr. Lowe . . . to the handgun." R. Vol. III at 58: 7–15; *see also* Reply at 1. Therefore, Mr. Lowe based his motion for judgment of acquittal on the § 924(c)(1)(A)(1) charge on specific arguments of insufficient evidence related to two elements: (1) the evidence failed to show Mr. Lowe committed MDMA trafficking (*i.e.*, element one); and (2) the evidence failed to show Mr. Lowe possessed a firearm (*i.e.*, element two). We conclude that Mr. Lowe's original motion for judgment of acquittal did not invoke an argument specific to the "possession of the firearm in furtherance of the drug trafficking crime" (*i.e.*, element three). Mr. Lowe now asks us to reverse the district court's denial of his motion for judgment of acquittal, claiming that evidence could not show a "link between [the MDMA] and the firearm." Aple. Br. at 49. Thus, Mr. Lowe challenges on appeal "a different element," *Murphy*, 100 F.4th at 1195, than the two elements his motion expressly challenged at the district court. *See United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007) (treating argument as forfeited when the defendant challenged at district court the evidentiary sufficiency of the

23

weapon and defendant nexus to meet the element of possession and challenged evidentiary sufficiency of commerce element on appeal).

"As a general matter, arguments not raised before the district court are forfeited on appeal." *United States v. Garcia*, 936 F.3d 1128, 1131 (10th Cir. 2019) (citing *Richison*, 634 F.3d at 1127–28). "On appeal, we can only consider forfeited arguments under the plain error standard of review." *Id*. Yet Mr. Lowe failed to make a plain-error argument in his opening brief, however, and failed to "allege plain error in [his] reply brief after the Government assert[ed] waiver" in its brief in response. *Leffler*, 942 F.3d at 1198. Accordingly, we may follow our ordinary course and "deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *Id*. at 1196.

But that is inappropriate in this context because the issue was preserved below. In *United States v. Hernandez-Rodriguez*, we concluded that when the district court "sua sponte raises and explicitly resolves an issue of law on the merits," the appellant "may challenge that ruling on appeal on the ground addressed by the district court even if he failed to raise the issue in district court." *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003). *See also Garcia*, 936 F.3d at 1132 ("[I]f the district court was 'adequately alerted to the issue,' and perhaps even responded to the issue, then we are able to review on appeal."). In such a scenario, we review not for 'plain error' but rather the "same standard of appellate review that would be applicable if the appellant had properly raised the issue." *Hernandez-Rodriguez*, 352 F.3d at 1328.

24

In a recent opinion, *United States v. Buntyn*, we applied the *Hernandez-Rodriguez* principle in the context of a motion for a judgment of acquittal for sufficiency of the evidence.  104 F.4th 805 (10th Cir. 2024).  In *Buntyn*, the defendant was charged with willfully violating detainees' rights under the Fourteenth Amendment's Due Process Clause.  104 F.4th at 806–07 (citing 18 U.S.C. § 242).  After the government rested its case, the defendant moved for a judgment in his favor, challenging only two elements, but not others.  The district court denied that challenge.  The defendant appealed, challenging the sufficiency of the evidence and broadening the sufficiency argument to additional elements not argued below.  Applying *Hernandez-Rodriguez*, we considered the challenge on the merits irrespective of what the defendant had argued in the district court.  *Id.* at 808 (applying *Hernandez-Rodriguez*, 352 F.3d at 1328–30).  We explained that because "the government responded to [the] motion by arguing that the evidence was sufficient not only on [the challenged element], but also on all other elements," and the district court's ruling "arguably addressed all the elements," *id*. at 808,  we, therefore, could review de novo the sufficiency of the evidence arguments.  *Id*.

The same is true here.  The government "responded to [the] motion by arguing that the evidence was sufficient not only on [the challenged element], but also on all other elements," and the district court's ruling "addressed all the elements." *Id.*  In addressing Mr. Lowe's motion for judgment of acquittal, the government stated:

> And I think establishing possession of the Kahr specifically,
> and in those phone calls I note, Your Honor, the defendant
> actually admits to actual possession, I believe on Friday, the

24th, where he mentions that, you know, the Kahr -- the two-toned one that he was showing to one of his friends I think earlier that day. I interpret that to mean earlier the Friday he was taken into custody. So that's actual possession. That means he had to place that firearm in that luggage that day. That's – that actual possession also is evidence of the constructive possession he had on the 27th when he sent people up there to try to get it before police did.

It's also evidence of his constructive possession of the narcotics in the luggage.

The narcotics that you heard from Detective Jeffers is an amount that is not common or, rather, is an amount for distribution along with all the other evidence of distribution. The gelatin capsules, the pill press, the baggies, the scales. Take that altogether, Your Honor, all that is sufficient at this time to proceed with the jury and let them make a determination on the charges. Thank you.

R. Vol. III at 62: 2–23 (emphasis added).

Given this, we find that the government addressed the "in furtherance of" element required for conviction. The government argued that phone calls established "possession of the Kahr specifically," which Mr. Lowe admitted to "plac[ing] . . . in the luggage that day." The government also argued that the firearm's placement in the luggage to the constructive possession of narcotics found in the same luggage was "also evidence of [Mr. Lowe's] constructive possession of the narcotics." Lastly, the government argued that testimony showed that the quantity of narcotics found was "an amount for distribution." These points collectively relate to factors relevant to

26

assessing whether the government has established the requisite nexus between the firearm and the drug-trafficking offense.[11]

The district court's ruling also expressly addressed all the elements. For the drug trafficking crime, the court found that "a reasonable jury could conclude that Mr. Lowe knowingly or intentionally possessed MDMA." Regarding possession, the court concluded that facts showing that Mr. Lowe's "DNA was very likely present on the Kahr firearm," supported "the inference that Mr. Lowe possessed the firearm." R. Vol. III at 67: 18–21. And in furtherance of the drug trafficking crime, the court concluded that "A reasonable jury could infer from these facts that Mr. Lowe possessed the Kahr firearm . . . for the purpose of assisting in or accomplishing his drug trafficking activities, i.e., in furtherance of those activities."[12] Thus, we reject the government's waiver argument and conclude that the government's response and the district court's ruling addressed all the elements of Mr. Lowe's evidentiary

---

[11] Our precedents have identified a nonexclusive list of factors relevant when assessing whether the government has established the requisite nexus between the firearm and the drug-trafficking offense, including: (1) "the type of drug activity being conducted, (2) the accessibility of the firearm, (3) the type of firearm, (4) the legal status of the firearm, (5) whether the firearm is loaded, (6) the proximity of the firearm to drugs or drug profits, (7) and the time and circumstances under which the firearm is found." *United States v. King*, 632 F.3d 646, 655 (10th Cir. 2011).

[12] Mr. Lowe also argued that "somebody stuffed them in the suitcase all together at the same time." Reply at 1 (brackets omitted). *Cf. Garcia*, 936 F.3d at 1132 (reviewing forfeited argument below despite no plain error argument where both parties sometime in the proceedings advocated for the argument and the district court fully addressed the argument on the merits).

sufficiency challenge to the § 924(c)(1)(A)(i) charge.  Accordingly, we review de novo Mr. Lowe's "challenge on the merits irrespective of what he had argued in district court."  *Buntyn*, 104 F.4th at 808 (citing *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 991–92 (10th Cir. 2019) (quoting *Hernandez-Rodriguez*, 352 F.3d at 1328)).[13]

### 2.  *Merits*

That said, we conclude that sufficient evidence existed to sustain Mr. Lowe's conviction.  In reviewing the sufficiency of the evidence, we consider all the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a

---

[13]  This conclusion is consistent with *United States v. Goode*, 483 F.3d 676 (10th Cir. 2007).  In that case, the district court instructed the jury to convict Mr. Goode only if it found that the government had proved beyond a reasonable doubt that: (1) the defendant was previously convicted of a felony; (2) the defendant knowingly possessed a firearm after the conviction; and (3) before the defendant possessed the firearm, the firearm had moved from one state to another.  *Goode*, 483 F.3d at 679.  After the jury was instructed, Mr. Goode moved for a judgment of acquittal under Federal Rule of Criminal rocedure. 29, arguing only that there was not a sufficiently legal nexus between the weapon and himself to meet the element of possession.  *Goode*, 483 F.3d at 676.  He did not address the commerce element.  The district court denied the motion, ruling that "there was sufficient evidence for a jury to conclude that Mr. Goode was in possession of the weapon."  *Id.*  Thus, the district court addressed only the possession element in its ruling.  On appeal, Mr. Goode contended there was insufficient evidence that the firearm had moved between states.  We reviewed this contention under the plain-error standard.  *Id.* at 681.

Mr. Lowe similarly did not initially address in his original Rule 29 motion an element required for conviction—the "in-furtherance" element of 18 U.S.C. § 924(c)(1)(A)(i).  But unlike in *Goode*, the district court ruled on the evidentiary sufficiency of all elements necessary for conviction.  And the government addressed all elements necessary for conviction during argument on the Rule 29 motion.

28

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis added) (citation omitted). We do not weigh conflicting evidence or consider witness credibility. *King*, 632 F.3d at 650 (citation omitted). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *United States v. Serrata*, 425 F.3d 886, 895 (10th Cir. 2005) (quoting *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999)). Thus, "[w]e may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *King*, 632 F.3d at 650 (quoting *United States v. Ramos-Arenas*, 596 F.3d 783, 786 (10th Cir. 2010).

As stated above, convicting Mr. Lowe under § 924(c)(1)(A)(i) required proof beyond a reasonable doubt of (1) a drug trafficking crime; (2) possession of a firearm (3) and possession of the firearm in furtherance of the drug trafficking crime. Only the third element is at issue on appeal, which "requires that the government establish some nexus between the firearms and the underlying drug trafficking crime." *Id*. We conclude that the government met its burden.

*First*, the government presented evidence that Mr. Lowe possessed items typically associated with drug trafficking, including the means to protect himself while engaging in it. "Some items like firearms, large sums of cash, weighing scales, and uncharged quantities of illegal drugs are generally viewed as tools of the trade— that is, means for the distribution of illegal drugs." *United States v. Hall*, 473 F.3d 1295, 1304 (10th Cir. 2007) (internal quotation marks omitted). Mr. Lowe has not

appealed his conviction for possessing MDMA with intent to distribute it, and he acknowledges on appeal that "[e]vidence supporting" that conviction—the gelatine capsules, baggies, and digital scales—were "found in [his] apartment." Aplt. Br. at 49. These items are probative of a defendant's "participation in the drug distribution business." *Hall*, 473 F.3d at 1304. Moreover the MDMA was found in the "same compartment of the suitcase" as the firearms, Aple. Br. at 36, indicating that the firearm was "easily available" for use when engaging in drug trafficking, *King*, 632 F.3d at 658. *See also id.* at 656 ("When guns and drugs are found together and a defendant has been convicted of possession with intent to distribute, the gun . . . may reasonably be considered to be possessed 'in furtherance of' an ongoing drug-trafficking crime."). Therefore, these facts permit a jury to find that Mr. Lowe intended to have the firearm available to protect his drug operation. *United States v. Basham*, 268 F.3d 1199, 1208 (10th Cir. 2001) ("[A] firearm that is kept available for use if needed during a drug transaction is 'possessed in furtherance of' drug trafficking[.]").

*Second*, the government presented evidence of a loaded firearm near the drugs, indicating Mr. Lowe's intent to use it for protection in drug trafficking. "A loaded firearm is obviously better suited to serve as protection for illegal drugs that a defendant intends to distribute." *United States v. McGehee*, 672 F.3d 860, 872 (10th Cir. 2012) (internal quotation omitted) (citing King, 632 F.3d at 656). The Kahr handgun found in the suitcase near the drugs was loaded. Aple. Br. at 36 (citing R. Vol. III at 243, 247); *see Robinson*, 435 F.3d at 1251 (affirming a § 924(c)(1)(A)

conviction where "the firearm was a fully loaded and chambered high-powered rifle easily within reach" and "in close proximity to drug paraphernalia").  Moreover, the firearm, while not stolen, was "illegally possessed" since Mr. Lowe was at the time "a convicted felon and had no right to possess it."  *McGehee*, 672 F.3d at 872.  Therefore, the illegally possessed loaded firearm and its proximity to the MDMA support conviction under § 924(c)(1)(A).  What is more, the government's evidence that Mr. Lowe used language (*e.g.*, "tools") that are consistent with drug trafficking codewords regarding the sale of drugs provides circumstantial evidence of his intention to sell drugs.

Mr. Lowe resists this conclusion by arguing that "[n]o evidence . . . directly tied" him to the drugs or the gun.  Reply at 1.  *See also* Reply Br. at 2 ("zero evidence" linking the "firearm in the storage locker" to "the furtherance of a drug transaction").  He contends that nothing at trial demonstrated his use of a firearm during any alleged drug sales and that the gun's location fails to prove it was used in furtherance of a particular drug trafficking crime.

These arguments fail.  For one thing, "[t]he intent to possess the weapon to further the drug trafficking crime is generally proven through circumstantial evidence[.]"  *United States v. Rogers*, 556 F.3d 1130, 1140 (10th Cir. 2009).  And more to the point: the offense here "does not require evidence that the gun was actively used or employed, only evidence that it was 'possessed' in furtherance of a drug-trafficking crime."  *King*, 632 F.3d at 656 (citing *Basham*, 268 F.3d at 1208 (recognizing passive possession).  So the government need not prove that the firearm

31

was used for a particular transaction for that evidence to be probative. *See Hall*, 473 F.3d at 1304.

### C.    Sixth Amendment Violation

Mr. Lowe next claims that the district court violated his Sixth Amendment rights by erroneously finding methamphetamine in the mixture he possessed since the lab results did not confirm the presence of methamphetamine.

The government asserts that Mr. Lowe did not raise a Sixth Amendment challenge at the district court. Aple. Br. at 39 (citing R. Vol I:62-63; R. Vol. II:16; R. Vol. III:20-23). We agree. All that Mr. Lowe did was object to the base offense level calculation, arguing that the lab report did not specify an amount of methamphetamine present in the mixture. R. Vol I:62-63 (objections); R. Vol. III:20-23 (sentencing hearing). But he did not explicitly raise a Sixth Amendment claim at the district court. Put another way: while Mr. Lowe contested the drug quantity and the presence of methamphetamine, he did not specifically frame this contention as a Sixth Amendment violation during the district court proceedings. And Mr. Lowe did not "allege plain error in a reply brief after the Government assert[ed] waiver" in its brief in response. *Leffler*, 942 F.3d at 1198. "When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *Id*. at 1196 (citing *Richison*, 634 F.3d at 1130–31). That is appropriate here since the government would have been prevented from responding in writing to Mr. Lowe's arguments on the plain error standards. *See id*. at 1198

("But we will only exercise our discretion if it 'permits the appellee to be heard and the adversarial process to be served.'") (quoting *United States v. Isabella*, 918 F.3d 816, 844 (10th Cir. 2019)).  We, therefore, conclude that Mr. Lowe waived the Sixth Amendment claim.

But even if we reached the merits of the underlying contention, the record shows that "detectable" or "trace" amounts of methamphetamine were found.  Under *United States v. Valdez*, 225 F.3d 1137 (10th Cir. 2000), that is enough.  In that case, we dealt with an amount of methamphetamine that was "detectable but not measurable or quantifiable."  *Id*. at 1142.  We held that "a substance containing an 'unquantifiable trace' of methamphetamine still contains a sufficiently detectable amount of the drug to be included as relevant conduct."  *Id*. at 1143 (citing *United States v. Killion*, 7 F.3d 927, 935 (10th Cir. 1993)).  We thus concluded that "sufficient evidence in the record [supported] the district court's finding that the substances underlying the acquitted charges contained a detectable amount of methamphetamine."  *Id*. at 1143–44.  Thus, the trace amounts of methamphetamine sufficed to be considered at sentencing.

Applying that logic and reasoning, we conclude the same here.[14]

---

[14] To the extent Mr. Lowe challenges the procedural reasonableness of the district court's calculation of his total offense level based on a methamphetamine mixture, this argument fails for the same reason.

33

### D.    *Amendment 821 to the Sentencing Guidelines*

Finally, Mr. Lowe contends that his case warrants a remand for resentencing under Amendment 821 to the Sentencing Guidelines.  The government asserts in response that whether Mr. Lowe qualifies for a sentence reduction under the amendment is "a matter for the district court, in its discretion, to determine in the first instance under 18 U.S.C. § 3582(c)(2)."  We agree.

Section 3582(c)(2) allows a court to reduce a sentence for a defendant "who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission."  In a recently decided unpublished case, we determined that we lacked jurisdiction to consider a similar request on direct appeal.  *United States v. Moreno*, No. 23-4102, 2024 WL 159928, at *1 (10th Cir. Jan. 16, 2024) (dismissing appeal for lack of jurisdiction when the defendant did not seek a sentence reduction under Sentencing Guidelines Amendment 821 in the district court).  As we explained, "where [defendants] [do] not move to reduce [their] sentence in the district court," and "assert[] for the first time on appeal that [they] qualif[y] for a retroactive sentencing reduction under Sentencing Guidelines Amendment 821," we "have no final decision of the district court to review and therefore lack jurisdiction to consider [the] issue." *Id.*  (first citing 28 U.S.C. § 1291; then citing *Rekstad v. First Bank Sys., Inc.*, 238 F.3d 1259, 1261 (10th Cir. 2001) ("[a]side from a few well-settled exceptions, federal appellate courts have jurisdiction solely over appeals from 'final decisions of the district courts of the United States.'")).

Mr. Lowe explains that "the retroactivity of Amendment 821 was not determined and voted on by the Sentencing Commission until August 24, 2023—after [his] sentence was imposed." Aplt. Br. at 58.  We conclude that this provides no reason to deviate from the reasoning in Moreno to reach a different conclusion in Mr. Lowe's case.[15]

\*     \*     \*

Accordingly, we **AFFIRM** the district court's denial of Mr. Lowe's motion to suppress and **AFFIRM** Mr. Lowe's conviction and sentencing.

---

[15] We acknowledge that the Seventh Circuit allowed a remand for resentencing under 28 U.S.C. § 2106 on the defendant's robbery convictions. *See United States v. Claybron*, 88 F.4th 1226, 1231 (7th Cir. 2023) (holding that the post-sentencing proposal and enactment of retroactive Amendment 821 warranted a § 2106 remand and limited resentencing on robbery convictions).  In that case, the defendant specifically urged the Court to remand using § 2106. *Id.* at 1231.  No such request was made here.